## MISSOURI *v.* ILLINOIS AND THE SANITARY DISTRICT OF CHICAGO.

ORIGINAL.

No. 5. Original. Argued November 12, 13, 1900.—Decided January 28, 1901.

This suit was brought by the State of Missouri against the State of Illinois and the Sanitary District of Chicago. The latter is alleged to be "a public corporation, organized under the laws of the State of Illinois and located in part in the city of Chicago, and in the county of Cook, in the State of Illinois, and a citizen of the State of Illinois." The remedy sought for is an injunction restraining the defendants from receiving or permitting any sewage to be received or discharged into the artificial channel or drain constructed by the Sanitary District, under authority derived from the State of Illinois, in order to carry off and eventually discharge into the Mississippi the sewage of Chicago, which had been previously discharged into Lake Michigan, and from permitting the same to flow through said channel or drain into the Des Plaines River, and thence by the river Illinois into the Mississippi. The bill alleged that the nature of the injury complained of was such that an adequate remedy could only be found in this court, at the suit of the State of Missouri. The object of the bill was to subject this public work to judicial supervision, upon the allegation that the method of its construction and maintenance will create a continuing nuisance, dangerous to the health of a neighboring State and its inhabitants, and the bill charged that the acts of the defendants, if not restrained, would result in the transportation, by artificial means, and through an unnatural channel, of large quantities of undefecated sewage daily, and of accumulated deposits in the harbor of Chicago, and in the bed of the Illinois River, which will poison the water supply of the inhabitants of Missouri, and injuriously affect that portion of the bed or soil of the Mississippi River which lies within its territory. The bill did not assail the drainage canal as an unlawful structure, nor aim to prevent its use as a waterway, but it sought relief against the pouring of sewage and filth through it by artificial arrangements into the Mississippi River, to the detriment of the State of Missouri and its inhabitants. The defendants demurred to the bill for want of jurisdiction and for reasons set forth in the demurrer. This court *held* that the demurrer could not be sustained, and required the defendants to appear and answer.

In January, 1900, the State of Missouri filed in this court a bill of complaint against the State of Illinois and the Sanitary

District of Chicago, a corporation of the latter State, in the following terms:

" The complainant, the State of Missouri, and one of the States of the United States, brings this its bill of complaint against the State of Illinois, one of the States of the United States, and the Sanitary District of Chicago, a public corporation, organized under the laws of the State of Illinois, and located in part in the city of Chicago and in the county of Cook, in said State of Illinois, and a citizen of the State of Illinois.

" And your orator complains and says that it is a State containing a population of upwards of three millions of people, and lying on the west bank of the Mississippi River, a public, navigable and running stream, and having a frontage on said stream of over four hundred miles.

" And your orator shows that by the act of Congress providing for the organization and admission of Illinois and Missouri as States of the Union it was declared that the western boundary of Illinois and the eastern boundary of Missouri should be the middle of the main channel of the Mississippi River; that the shores of the Mississippi River, where its waters form the Missouri and Illinois boundary, and the soil under the waters thereof, were not granted by the Constitution of the United States, but were reserved to the States of Illinois and Missouri respectively.

" And your orator shows that the States of Missouri and Illinois each have concurrent general jurisdiction over the waters of the Mississippi River forming the boundary between them, and each of said States has exclusive territorial jurisdiction over that portion adjacent to its own shore, and your orator shows that the Illinois River empties into the Mississippi River at a point above the city of St. Louis, on the Illinois side of said Mississippi River.

" And your orator further shows that within the territory of your orator and on the banks and shores of said Mississippi River and below the mouth of the Illinois River are many cities and towns in the State of Missouri, and many thousands of persons who are compelled to and do rely upon the waters of said river, in their regular, natural and accustomed flow, for their daily

necessary supply of water for drinking and all other domestic and agricultural and manufacturing purposes, and for watering stock and animals of all kinds, and that said Mississippi River has been flowing in its regular course and has been used for the purposes aforesaid by the inhabitants of the said State of Missouri for a time whereof the memory of a man runneth not to the contrary, and that said river and its waters and the use thereof for drinking, agricultural and manufacturing purposes, in their accustomed and natural flow, are indispensable to the life and health and business of many thousands of the inhabitants of the State of Missouri and of great value to your orator as a State.

"And your orator shows that cities and towns below the mouth of said Illinois River, within the territory of your orator, do and are compelled, by means of water works, water towers and intakes, built and constructed for that purpose, to supply the inhabitants of said cities and towns with an adequate supply of pure and wholesome water, fit and healthful for drinking and all other domestic purposes and uses, from the said Mississippi River so flowing in its ancient, accustomed and natural course.

"And your orator shows that said water works systems are constructed with reference to said Mississippi River and for the purpose of taking water therefrom and not from any other source.

"And your orator shows that heretofore, to wit, in 1889, the State of Illinois enacted a law known as the Sanitary District act, together with an act for the improvement of the Illinois and Des Plaines Rivers, and that under said act of said State the said corporation known as the said Sanitary District of Chicago was organized and is now existing and operating, and that by the express terms of said act any canal or drain corporation organized in accordance with its provisions may have conditions, restrictions or additional requirements placed on said corporation, or the act authorizing the creation of said corporation may be amended or repealed, and that by the express provisions of said act, before any water or sewage shall be admitted into any channel constructed under said act, the trustees of said channel shall notify the Governor of Illinois

of the completion of said channel, and the Governor of Illinois shall appoint three commissioners to examine said canal or channel and report to the Governor if the same complies with the act of the State of Illinois; and if it does, the Governor shall authorize the water and sewage to be turned into said channel; and that without the said permit it cannot be so turned in; and that by the general provisions of said act said channel is at all times subject to the control and supervision of the State of Illinois and her authorities.

" And your orator further shows that the Chicago River is situated in the basin of Lake Michigan and has two forks or branches flowing through the city of Chicago and into Lake Michigan, and that the natural drainage of Chicago, Illinois, is into Lake Michigan, and the sewage and drainage of the territory embraced in the defendant's district, the Sanitary District of Chicago, is led into or flows into the Chicago River and Lake Michigan.

" And your orator further shows that the defendant herein, the Sanitary District of Chicago, with the authority of the State of Illinois, and acting as a governmental agency of said State, and under the supervision and control and subject to the approval of the State of Illinois, has constructed a channel or open drain from the west fork of the south branch of the Chicago River, in the city of Chicago and county of Cook, in the State of Illinois, to a point near Lockport, in the county of Will, in said State, where said channel or drain connects with and empties into the Des Plaines River, which empties into the Illinois River, and which latter river flows and empties into the Mississippi River at a point distant about forty-three miles above the city of St. Louis, Missouri.

" And your orator further states that the channel built by the Sanitary District of Chicago was so built by said Sanitary District as one of the governmental agencies of the State of Illinois, and by the pretended lawful authority of said State, and under the direction, supervision and control and governmental power of the State of Illinois, and which said State has heretofore at all times sanctioned and now, through its Governor and other officers, sanctions the building of said channel and opening thereof.

"And your orator further shows that in the construction of said channel or drain the defendant, the Sanitary District of Chicago, Illinois, with the sanction and approval of the State of Illinois, cut through the natural ridge or watershed which divides the basin of Lake Michigan from the basins of the Des Plaines and Illinois Rivers and the basin of the Mississippi River, and that having so constructed said channel and having about completed the same, and having, under the supervision of and with the sanction of the State of Illinois, extended said artificial channel through said natural divide of the watershed, the defendants now propose and threaten to receive into said channel or drain the sewage matter and filth of the Sanitary District of Chicago, which embraces nearly the whole city of Chicago and a portion of the county of Cook, and, without any legal authority so to do, has already in part effectuated its said threat and purpose and threatens to permit and to cause said sewage and filth, by artificial means of pumping and otherwise, to flow through the channel or drain towards and into the said Des Plaines River and eventually into the Mississippi River, thereby, with the approval of and subject to the inspection and control and supervision of the State of Illinois, and by the pretended authority thereof, reversing the natural flow of said Chicago River.

"And your orator further shows that the sewage matter and poisonous filth which it is thus threatened to receive and to permit and to cause to flow through said artificial channel into said Des Plaines River is that which is created by a population of upwards of one and one half millions of people, besides that which is created by a great number of stock yards, slaughtering establishments, rendering establishments, distilleries and other business enterprises and industries lining both sides of the Chicago River, producing filth and noxious matters; all of which are there discharged into the said Chicago River or drained therein from the surface.

"And your orator further shows that for many years past the said city of Chicago, the greater portion of which is embraced in the limits of the defendant corporation, the Sanitary District of Chicago, as aforesaid, has been discharging its sewage mat-

ter and filth into the Chicago River and into Lake Michigan in such large quantities that much of it has accumulated in the bed and along the sides of the river and upon the bed of said Lake Michigan, near the shores thereof, and that the plan threatened and attempted now to be adopted by the defendant, the Sanitary District of Chicago, acting in conjunction with and subject to the control of the defendant, the State of Illinois, and by the pretended authority of the said State of Illinois, will loosen said accumulated matter and filth, and will also direct it and cause it to flow towards and into said artificial channel or drain, and thence into said Des Plaines River, and finally into the Mississippi River and into the waters thereof within the jurisdiction and under the control of your orator and past the homes of the inhabitants of your orator and the towns and cities within the borders of your orator, and past the water works of said cities and towns within the State of Missouri.

"And your orator further shows that the amount of said undefecated filth and sewage and poisonous and unhealthful and noxious matters proposed to be, and now about to be, permitted to be turned into said artificial channel and through said Des Plaines and Illinois Rivers into the Mississippi River from the said Sanitary District of Chicago by the defendants, acting jointly, will amount daily to about fifteen hundred tons, and that if defendants should be permitted to carry their said threats into execution, and should cause said above amount of undefecated sewage and other poisonous and noxious matters, which would otherwise flow into Lake Michigan, to flow into the Mississippi River, that the waters of the Mississippi River within the jurisdiction of your orator will of a certainty be poisoned and polluted and rendered wholly unfit and unhealthful for drinking and domestic uses, and will render wholly valueless and entirely worthless the various water works systems of towns and cities on the borders of the State of Missouri, established and acquired at great cost and expense, and will deprive your orator, the State of Missouri, and its inhabitants, of the right to use of the waters of said river for drinking and all other domestic and manufacturing and agricultural purposes, as said water has been so used in its accustomed and natural flow hereto-

fore for the length of time that the memory of man runneth not to the contrary thereof.

"And that said threatened action of the defendants will amount to a direct and continuing nuisance and be an interference with the use by your orator and its inhabitants of the waters of the Mississippi River flowing in their natural state, polluting and poisoning the same by the means aforesaid, whereby the health and lives of the inhabitants of your orator will be endangered and the business interests of said State will be greatly and irreparably injured, and which said damage to the lives and health and the business interests of said State resulting from said poisoning and polluting of said waters as aforesaid to your orator cannot be estimated in money value.

"And your orator on information and belief states and charges the fact to be that said fifteen hundred tons of poisonous undefecated filth and sewage of said Sanitary District of Chicago will be daily carried through said artificial channel and sent through the Des Plaines and Illinois Rivers into the Mississippi, and great quantities thereof will be deposited in the bed and soil of said river belonging to your orator and wholly within the jurisdiction thereof, to your orator's great and irreparable damage, and that the fifteen hundred tons of undefecated sewage and filth now about to be daily injected into the waters of the Mississippi River and into the portion thereof over which the State of Missouri has jurisdiction, and from which thousands of her inhabitants obtain drinking water, will pollute and poison the said water of the Mississippi River to such an extent as to render it unwholesome and unfit and unhealthful for use for drinking by the said inhabitants in the territory of your orator and unfit for use for watering stock and for manufacturing purposes.

"And your orator further shows that great quantities of undefecated sewage turned into the Mississippi River in the manner and by the means aforesaid will poison and pollute said water with the germs of disease of various and many kinds. And your orator further shows that the acts herein complained of on the part of the State of Illinois, acting in conjunction with one of her governmental agencies, the said Sanitary District of

Chicago, will cause a continuing nuisance in the Mississippi River, and that the said State of Illinois has no power or authority to cause or permit or assist in causing the commission and continuance of a nuisance in the flowing waters of the Mississippi River, a navigable stream, to the detriment and irreparable and continuing damage and injury of the State of Missouri, and the continuing and irreparable injury to the lives and health of the citizens and inhabitants of the State of Missouri, and that unless restrained by the order and decree of this court the defendants, the State of Illinois and the Sanitary District of Chicago, acting together, will, in accordance with the terms of the act under which said Sanitary District is organized, upon the permit and authority of the Governor of Illinois and of the State of Illinois, turn said water and sewage aforesaid, by the manner and means aforesaid, into the Des Plaines and Illinois Rivers and thence into the Mississippi, all of which your orator says and avers is contrary to equity and good conscience, and would result in the manifest and irreparable injury of your orator and the health of her citizens in the premises, and your orator is wholly without remedy at law and without any adequate remedy to prevent the flowing of said sewage, as aforesaid, save by the interposition of this court.

"For as much as your orator can have no adequate relief except in this court, and to the end, therefore, that the defendants may, if they can, show why your orator should not have the relief prayed, and to the end that the defendants may make a full, true, direct and perfect answer to the matters hereinbefore stated and charged, but not under oath, an answer under oath being hereby expressly waived, and to the end that the defendants, their officers, agents, servants and employés may be restrained by injunction issuing out of this court from receiving or permitting any sewage to be received or discharged into said artificial channel or drain, and from permitting the same to flow or causing the same to be made to flow through said channel or drain towards and into the Des Plaines River, your orator prays that your honors may grant a writ of injunction, under the seal of this honorable court, properly restraining and enjoining the defendants, the officers, agents, employés and

servants of the Sanitary District of Chicago and the State of Illinois, from permitting or causing any of said sewage to be discharged into said channel or drain, and from permitting or causing said sewage and poisonous filth thence to flow into said Des Plaines River; that defendant, the State of Illinois, be enjoined and restrained from issuing to its codefendant permission and authority to do and perform the acts aforesaid or to allow them to be done; and your orator also prays for a provisional or temporary injunction pending this cause, restraining and enjoining the several acts aforesaid, and for such other and further relief as the equity of the case may require and to your honors may seem meet.

"May it please your honors to grant unto your orator not only a writ of injunction conformable to the prayer of this bill, but also a writ of subpœna of the United States of America, directed to the State of Illinois, the Governor and Attorney General thereof, and to said Sanitary District of Chicago, its officers, trustees and agents, commanding them on a day certain to appear and answer unto this bill or complaint, and to abide such order and decree of the court in the premises as to the court shall seem proper and required by the principles of equity and good conscience."

In March, 1900, came the defendants and filed a demurrer to the bill of complaint, in the following terms:

"Now comes the State of Illinois by its Attorney General, Edwin C. Akin, and the Sanitary District of Chicago, by its attorneys, and demur to the bill of complaint filed herein, and say that the said bill of complaint and the matters therein contained, in manner and form as the same are above stated and set forth, are not sufficient in law for the said State of Missouri to have and maintain its aforesaid action against the said State of Illinois and the Sanitary District of Chicago, and that said defendants are not bound by the law of the land to answer the same; and the said defendants, according to the form of the statute in such case made and provided, state and show to the court here the following causes of demurrer to the said bill of complaint:

"First. That this court has no jurisdiction of either the

parties to, or of the subject-matter of, this suit, because it appears upon the face of said bill of complaint that the matters complained of, as set forth therein, do not constitute, within the meaning of the Constitution of the United States, any controversy between the State of Missouri and the State of Illinois, or any of its citizens.

"*Second.* That the matters alleged and set forth in said bill of complaint show that the only issues presented therein arise, if at all, between the State of Illinois and a public corporation created under the laws of said State, and certain cities and towns, in their corporate capacity as such, in the State of Missouri, and certain persons in said State of Missouri, residing on or near the banks of the Mississippi River, and which matters so stated in said bill of complaint, if true, do not concern the State of Missouri as a corporate body or State.

"*Third.* That said bill of complaint shows upon its face that this suit is in fact for and on behalf of certain cities and towns in said State of Missouri, situate on the banks of the Mississippi River, and certain persons who reside in said State on or near the banks of said river; and that, although the said suit is attempted to be prosecuted for and in the name of the State of Missouri, said State is, in effect loaning its name to said cities and towns and to said individuals, and is only a nominal party to said suit, and that the real parties in interest are the said cities and towns in their corporate capacity as such, and said private persons or citizens of said State.

"*Fourth.* That it appears upon the face of said bill of complaint that the said State of Missouri, in her right of sovereignty, is seeking to maintain this suit for the redress of the supposed wrongs of certain cities and towns in said State, in their corporate capacity as such, and of certain private citizens of said State, while under the Constitution of the United States and the laws enacted thereunder, the said State possesses no such sovereignty as empowers it to bring an original suit in this court for such purpose.

"*Fifth.* That it appears upon the face of said bill of complaint that no property rights of the State of Missouri are in any manner affected by the matters alleged in said bill of com-

plaint; nor is there any such property right involved in this suit as would give this court original jurisdiction of this cause.

"*Sixth.* That in order to authorize this court to maintain original jurisdiction of this suit as against the State of Illinois, or against any citizens of said State, it must appear that the controversy set forth in the bill of complaint and to be determined by this court, is a controversy arising directly between the State of Missouri and the State of Illinois, or some of its citizens, and not a controversy in vindication of the alleged grievances of certain cities and towns in said State or of particular individuals residing therein.

"*Seventh.* That said bill of complaint is in other respects uncertain, informal and insufficient, and that it does not state facts sufficient to entitle the said State of Missouri to the equitable relief prayed for in said bill of complaint.

"Wherefore, for want of a sufficient bill of complaint in this behalf, the said defendants pray judgment; and that the said State of Missouri may be barred from having or maintaining the aforesaid action against said defendants, and that this court will not take further cognizance of this cause, and that the said defendants be hence dismissed with their costs."

On November 12, 1900, the case came on to be heard on bill and demurrer, and was argued by counsel.

*Mr. William M. Springer* and *Mr. Charles C. Gilbert* for the demurrer. *Mr. Edward C. Akin* and *Mr. Samuel M. Burdett* were on their brief.

*Mr. B. Schnumacher* in opposition to the demurrer. *Mr. Edward C. Crow* was on his brief.

MR. JUSTICE SHIRAS, after making the foregoing statement, delivered the opinion of the court.

This cause is now before us on the bill of complaint and the demurrer thereto.

The questions thus presented are two: First, whether the allegations of the bill disclose the case of a controversy between

the State of Missouri and the State of Illinois and a citizen thereof, within the meaning of the Constitution and statutes of the United States, which create and define the original jurisdiction of this court; and, second, whether, if it be held that the allegations of the bill do present such a controversy, they are sufficient to entitle the State of Missouri to the equitable relief prayed for.

The question whether the acts of one State in seeking to promote the health and prosperity of its inhabitants by a system of public works, which endangers the health and prosperity of the inhabitants of another and adjacent State, would create a sufficient basis for a controversy, in the sense of the Constitution, would be readily answered in the affirmative if regard were to be had only to the language of that instrument.

" The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. . . . The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority, . . . to controversies between two or more States, between a State and citizens of another State. . . . In all cases, . . . in which a State shall be a party, the Supreme Court shall have original jurisdiction." Constitution, Article 3.

As there is no definition or description contained in the Constitution of the kind and nature of the controversies that should or might arise under these provisions, it might be supposed that, in all cases wherein one State should institute legal proceedings against another, the original jurisdiction of this court would attach.

But in this, as in other instances, when called upon to construe and apply a provision of the Constitution of the United States, we must look not merely to its language but to its historical origin, and to those decisions of this court in which its meaning and the scope of its operation have received deliberate consideration.

After the declaration of independence the united colonies, through delegates appointed by each of the colonies, considered

Articles of Confederation, which were debated from day to day, and from time to time, for two years, and were oh July 9, 1778, ratified by ten States; by New Jersey, on November 26 of the same year; by Delaware, on the 23d of February, 1779, and by Maryland on March 1, 1781.

The first Article was as follows: "The style of this Confederacy shall be, 'The United States of America.'"

The ninth Article contained, among other provisions, the following:

"The United States in Congress assembled shall also be the last resort on appeal in all disputes and differences now subsisting, or that hereafter may arise, between two or more States, concerning boundary, jurisdiction or any other cause whatever; which authority shall always be exercised in the manner following: Whenever the legislature or executive authority, or lawful agent, of any State, in controversy with another, shall present a petition to Congress, stating the matter in question, and praying for a hearing, notice thereof shall be given by order of Congress to the legislative or executive authority of the other State in controversy, and a day assigned for the appearance of the parties, by their lawful agents, who shall then be directed to appoint, by joint consent, commissioners or judges to constitute a court for hearing and determining the matter in question; but if they cannot agree, Congress shall name three persons out of each of the United States, and from the list of such persons each party shall alternately strike out one, the petitioners beginning, until the number shall be reduced to thirteen; and from that number not less than seven nor more than nine names, as Congress shall direct, shall, in the presence of Congress, be drawn out by lot; and the persons whose names shall be so drawn, or any five of them, shall be commissioners or judges, to hear and finally determine the controversy, so always as a major part of the judges, who shall hear the cause, shall agree in the determination; and if either party shall neglect to attend at the day appointed, without showing reasons which Congress shall judge sufficient, or being present shall refuse to strike, the Congress shall proceed to nominate three persons out of each State, and the secretary of Congress shall strike in be-

half of such party absent or refusing; and the judgment and sentence of the court, to be appointed in the manner before prescribed, shall be final and conclusive; and if any of the parties shall refuse to submit to the authority of such court, or to appear or defend their claim or cause, the court shall nevertheless proceed to pronounce sentence or judgment, which shall in like manner be final and decisive—the judgment or sentence, and other proceedings, being in either case transmitted to Congress, and lodged among the acts of Congress for the security of the parties concerned: provided, that every commissioner, before he sits in judgment, shall take an oath, to be administered by one of the judges of the supreme or superior court of the state where the cause shall be tried, well and truly to hear and determine the matter in question, according to the best of his judgment, without favor, affection or hope of reward : provided, also, that no State shall be deprived of territory for the benefit of the United States."

It will therefore be perceived that under the confederation the necessity of a tribunal to hear and determine matters in question between two or more States was recognized; that a court was provided for that purpose; and that the scope or field within which it was expected such matters in question or controversies should or might arise for the determination of such court, extended to "*all disputes and differences now subsisting or that may hereafter arise between two or more States concerning boundary, jurisdiction or any other cause whatever.*"

When the Federal convention met in 1787 to form the present Constitution of the United States several drafts of such an instrument were presented for the consideration of the convention. One of these was offered on May 29 by Edmund Randolph, of Virginia, in the shape of resolutions covering the entire subject of a national government. The ninth resolution prescribed the formation of a national judiciary, to consist of a supreme and inferior tribunals, with jurisdiction to hear and determine, among other things, "questions which involve the internal peace or harmony." Elliot's Deb. vol. 1, p. 143. On the same day Charles Pinckney, of South Carolina, submitted a draft of a Federal Government, the seventh article whereof was as follows:

" The Senate shall have the sole and exclusive power to declare war and to make treaties, and to appoint ambassadors and other ministers to foreign nations, and judges of the Supreme Court."

" They shall have the exclusive power to regulate the manner of deciding all disputes and controversies now subsisting, or which may arise, between the States respecting jurisdiction or territory."   Elliot's Deb. vol. 1, p. 145.

On June 19 the committee of the whole, to which had been referred the several propositions and drafts, reported to the convention for its consideration a draft as altered, amended and agreed to in the committee.   The thirteenth resolution was as follows:

" That the jurisdiction of the national judiciary shall extend to cases which respect the collection of the national revenue, impeachment of any national officers, and questions which involve the national peace and harmony."   Elliot's Deb. vol. 1, p. 182.

On August 6, a committee of five members, to which the various propositions, as originally made and as amended in the committee of the whole, reported to the convention a draft of the Constitution, the ninth article of which was as follows:

" Sec. 1. The Senate of the United States shall have power to make treaties and appoint ambassadors and judges of the Supreme Court.

" Sec. 2. In all disputes and controversies now subsisting, or that may hereafter subsist, between two or more States, respecting jurisdiction or territory, the Senate shall possess the following powers, etc.   [And here follows a scheme for a special court, in terms similar to that provided in the articles of confederation.]

" Sec. 3. All controversies concerning lands claimed under different grants of two or more States, whose jurisdiction, as they respect such lands, shall have been decided or adjusted subsequent to such grants, or any of them, shall, on application to the Senate, be finally determined, as near as may be, in the same manner as is before prescribed for deciding controversies between different States."

The eleventh article contained, among other sections, the following:

"Sec. 1. The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as shall, when necessary, from time to time, be constituted by the legislature of the United States. . . .

"Sec. 3. The jurisdiction of the Supreme Court shall extend to all cases arising under laws passed by the legislature of the United States; to all cases affecting ambassadors, other public ministers and consuls; to the trial of impeachment of officers of the United States; to all cases of admiralty and maritime jurisdiction; to controversies between two or more States, except such as shall regard territory or jurisdiction; between a State and citizens of another State; between citizens of different States; and between a State or the citizens thereof and foreign states, citizens or subjects." Elliot's Deb. vol. 1, p. 224.

It may be observed, in passing, that, in this draft, all disputes and controversies between two or more States, respecting jurisdiction or territory, are to be determined by a special court to be constituted by the Senate; and controversies between two or more States, except such as shall regard territory or jurisdiction, are determinable by the Supreme Court. It is, therefore, apparent that other disputes or controversies between States were regarded and provided for besides those respecting territory or jurisdiction.

This draft, together with numerous suggestions and amendments, was on August 7 submitted to the committee of the whole.

On September 12 a committee on revision reported a draft of the Constitution as revised and arranged. This draft, which, as respects our present subject, was in the terms of the Constitution as finally adopted, took from the Senate the power to constitute a court to try disputes between the States respecting territory or jurisdiction, and struck out the provision excluding from the jurisdiction of the Supreme Court disputes between the States in matters respecting jurisdiction and territory. The entire jurisdiction of controversies between States was bestowed upon the Supreme Court, in the second section of article three, in the following terms:

"The judicial power shall extend to all cases in law and

equity, arising under this Constitution, the laws of the United
States and the treaties made, or which shall be made, under
their authority; to all cases affecting ambassadors, other pub-
lic ministers and consuls; to all cases of admiralty and mari-
time jurisdiction; to controversies to which the United States
shall be a party; to controversies between two or more States;
between a State and citizens of another State; between citizens
of different States; between citizens of the same State, claim-
ing lands under grants of different States, and between a State
or the citizens thereof, and foreign states, citizens or subjects.

" In all cases affecting ambassadors, other public ministers
and consuls, and those in which a State shall be a party, the
Supreme Court shall have original jurisdiction. In all other
cases before mentioned the Supreme Court shall have appel-
late jurisdiction, both as to law and fact, with such exceptions,
and under such regulations, as the Congress shall make."

As in this section power is conferred on Congress to make
regulations affecting the exercise by the Supreme Court of its
jurisdiction, it may not be out of place to quote the provisions
in this respect of the judiciary act of 1789:

" The Supreme Court shall have exclusive jurisdiction of all
controversies of a civil nature where a State is a party, except
between a State and its citizens, or between a State and citi-
zens of other States or aliens, in which latter cases it shall
have original, but not exclusive, jurisdiction." Revised Stat.
sec. 687.

The case of *New York* v. *Connecticut*, 4 Dall. 1, in 1799, was
the first instance of an exercise by the Supreme Court of its
jurisdiction in a controversy between two States. It was a
case of a bill in equity filed by the State of New York against
the State of Connecticut and certain private persons who were
grantees of the latter State of lands, the jurisdiction over which
was claimed by both States. The object of the bill was to ob-
tain an injunction to stay proceedings in ejectment pending in
the Circuit Court of the United States for the District of Con-
necticut.

The court was of opinion that, as the State of New York
was not a party to the suits below, nor interested in the deci-

sions of those suits, an injunction ought not to issue. No argument was made that the court had not jurisdiction, and the court proceeded on the assumption that it possessed jurisdiction, although, under the facts of the case, it refused the injunction prayed for.

*New Jersey* v. *New York*, 5 Pet. 284, was the case of a bill filed by the State of New Jersey against the State of New York for the purpose of ascertaining and settling the boundary between the two States. In an opinion awarding the process of subpœna Chief Justice Marshall said:

"The Constitution of the United States declares that 'the judicial power shall extend to controversies between two or more States.' It also declares that 'in all cases affecting ambassadors, other public ministers and consuls, and those in which a State shall be a party, the Supreme Court shall have original jurisdiction.' . . . It has been settled by our predecessors, on great deliberation, that this court may exercise its original jurisdiction in suits against a State, under the authority conferred by the Constitution and existing acts of Congress."

In March, 1832, the State of Rhode Island filed in this court a bill against the State of Massachusetts, for the settlement of the boundary between the two States, and moved for a subpœna to be issued, according to the practice of the court in similar cases. An appearance was entered for Massachusetts, and a motion was made to dismiss the bill for want of jurisdiction. In support of the motion it was contended that this court had no jurisdiction because of the character of the respondent independent of the nature of the suit, and because of the nature of the suit independent of the character of the respondent. It was not denied that Massachusetts had agreed, by adopting the Federal Constitution, to submit her controversies with other States to judicial decision, but it was claimed that Congress had passed no law establishing a mode of proceeding, the character of the judgment to be rendered, and means of enforcing it. As respects the nature of the suit, it was argued that it was in its character political, brought by a sovereign, in that avowed character; that the judicial power of the United States extended, by the Constitution, only to cases of law and equity,

and that questions of jurisdiction over territory were not cases of that kind, nor of " a civil nature."

The court held that jurisdiction was conferred by the Constitution and the Judiciary Act, and that, as Massachusetts had appeared, submitted to the process, and pleaded in bar of the plaintiff's action certain matters on which the judgment of the court was asked, all doubts as to jurisdiction over the parties were at rest.

As respected the power of the court to hear and determine the subject-matters of the suit, it was held that jurisdiction existed ; that the dispute was a controversy between two States within the judicial power of the United States. 12 Pet. 657 ; 13 Pet. 23.

Before leaving this case it is to be remarked that the principal contest was as to whether a question of boundary, involving as it did the question of sovereignty over territory, was a judicial question of a civil nature. The implication was that the controversies between two or more States, in which jurisdiction had been granted by the Constitution, did not include questions of a political character. In some of the later cases the contention has been the very opposite; that the intention of the Constitution was only to apply to questions in which the sovereign and political powers of the respective States were in controversy.

In *Florida* v. *Georgia*, 11 How. 293, leave was given by this court to the State of Florida to file a bill against the State of Georgia, and process of subpœna was directed to be issued against the State of Georgia. The object of the bill was to ascertain and establish the boundary between the two States, which was in controversy. The State of Georgia answered, and the cause was proceeded in in pursuance of the prayers of the bill. Subsequently an application was made by the Attorney General of the United States, alleging that the latter were interested and concerned in the matter in controversy, and moving the court that he be permitted to appear in the case, and be heard in behalf of the United States, in such time and form as the court should order. This motion was opposed by the States, and the matter was argued at length. The

judges differed, but neither in the opinion of the majority, granting the motion of the Attorney General, nor in that of the dissenting minority, was any doubt expressed of the existence of the jurisdiction of the court over the controversy between the two States.

*Pennsylvania* v. *Wheeling & Belmont Bridge Company*, 9 How. 647; *Same* v. *Same*, 11 How. 528; *Same* v. *Same*, 13 How. 518; *Same* v. *Same*, 18 How. 421, 429, was a case in equity, in which the State of Pennsylvania filed a bill against the Wheeling and Belmont Bridge Company, a corporation of Virginia, and certain contractors, charging that the defendants, under color of an act of the legislature of Virginia, were engaged in the construction of a bridge across the Ohio River at Wheeling, which would, as was alleged, obstruct its navigation to and from the ports of Pennsylvania, by steamboats and other crafts which navigated the same. Many different questions were discussed by counsel and considered by the court, respecting the nature and extent of the jurisdiction of this court, the right of the complainant State, whether at law or in equity, and the character of the decree which could be rendered. Several observations made in the opinion of the court will be hereafter adverted to when we come to consider the second ground of demurrer urged in the case before us. It is sufficient for our present purpose to say that the original jurisdiction of the court was sustained, a commissioner was appointed to take and report proofs, and a decree was entered declaring the bridge to be an obstruction of the free navigation of the river; that thereby a special damage was occasioned to the plaintiff, for which there was not an adequate remedy at law, and directing that the obstruction be removed, either by elevating the bridge to a height designated, or by abatement.

*South Carolina* v. *Georgia*, 93 U. S. 4, was a suit in equity brought in this court, whereby the State of South Carolina sought an injunction to restrain the State of Georgia, the United States Secretary of War, the Chief Engineer of the United States army, their agents and subordinates, from obstructing the navigation of the Savannah River, in violation of an alleged compact subsisting between the States of South Carolina and

Georgia, and which had been entered into on April 24, 1787. This court, not denying but assuming jurisdiction in the case, held that, by adopting the Federal Constitution, and thereby delegating to the General Government the right to regulate commerce with foreign nations and among the several States, the compact between the two States, in respect to the Savannah River, ceased to operate, and that the acts complained of, being done in pursuance of congressional authority, and designed to improve navigation, could not be deemed an illegal obstruction, and accordingly the special injunction previously granted was dissolved and the bill dismissed.

*Wisconsin* v. *Duluth*, 96 U. S. 379, was the case of a bill in chancery filed in this court by the State of Wisconsin, by virtue of the constitutional provision which confers original jurisdiction of suits between the States and between a State and citizens of other States. The city of Duluth, a corporation and citizen of the State of Minnesota, was defendant; and, after answer, replication and the taking of a large amount of evidence, the case came on for a final decree. The nature of the case and the reasoning upon which this court proceeded in disposing of it will sufficiently appear in the following quotations from the opinion delivered by Mr. Justice Miller:

" The present suit was brought by the State of Wisconsin on the ground that the channel of the St. Louis River, as it flowed in a state of nature, was the common boundary between that State and the State of Minnesota, and that she had an interest in the continuance of the channel as an important highway for navigation and commerce in its natural and usual course; that the canal cut by Duluth across Minnesota Point, deeper than the natural outlet of the St. Louis River at its mouth, has diverted, and will continue to divert, the current of that river through Superior Bay into the lake by way of that canal. That the result of this is, that while the current cuts that canal deeper and gives an outlet for the water there at a lower level, it at the same time, by diverting this current from the old outlet, causes it to fill up, and thus destroy the usefulness of the river and bay as an aid of commerce, on which the State had a right to rely. The bill, after reciting the facts which we have already detailed,

insists that the city of Duluth cannot, by any right of her own, nor by any authority conferred on her by the State of Minnesota, thus divert the waters of the stream—the St. Louis River —from their natural course, to the prejudice of the rights of the State of Wisconsin or of her citizens.   It declares that this canal at Duluth does this in violation of law; and it prays this court to enjoin Duluth from protecting or maintaining it, and by way of mandatory injunction to compel that city to fill up the canal and restore things in that regard to the condition of nature in which they were before the canal was made.

"The answer, while admitting the construction of the canal, denies almost every other material allegation of the bill.   It denies especially that the canal has the effect of changing the course of the current of the river, or does any injury to the southern entrance to Superior Bay or diminishes the flow of water at that point.   A large amount of testimony, professional and non-professional, is presented on that subject.

"The answer also sets up, as an affirmative defence to the relief sought by the bill, that the United States, by the legislative and executive departments of the Government, have approved of the construction of the canal, have taken possession and control of the work, have appropriated and spent money on it, and adopted it as the best mode of making a safe and accessible harbor at the western end of the great system of lake navigation.

"Many very interesting questions have been argued, and ably argued, by counsel, which we have not found it necessary to decide.   The counsel for defence deny that the State of Wisconsin has any such legal interest in the flow of the waters in their natural course as authorizes her to maintain a suit for their diversion.   It is argued that this court can take cognizance of no question which concerns alone the rights of a State in her political or sovereign character.   That to sustain the suit she must have some proprietary interest which is affected by the defendant.   This question has been raised and discussed in almost every case brought before us by a State, in virtue of the original jurisdiction of the court.   We do not find it necessary to make any decision on the point as applicable to the case before

us.   Nor shall we address ourselves to the consideration of the mass of conflicting evidence as to the effect of the canal on the flow of the waters of Superior Bay.

"We will first consider the affirmative defence already mentioned; for, if that be found to be true in point of fact, it will preclude any such action by this court as the plaintiff has prayed for."

The court then proceeded to inquire into the action of the General Government in the matter of the canal in question, and found that, as matter of fact, the United States had taken possession and control of the canal as a public work.   The opinion concluded as follows:

"If, then, Congress, in the exercise of a lawful authority, has adopted and is carrying out a system of harbor improvements at Duluth, this court can have no lawful authority to forbid the work.   If that body sees fit to provide a way by which the great commerce of the lakes and the countries west of them, even to Asia, shall be securely accommodated at the harbor of Duluth by this short canal of three or four hundred feet, can this court decree that it must forever pursue the old channel, by the natural outlet, over water too shallow for large vessels, unsafe for small ones, and by a longer and much more tedious route?

"When Congress appropriates $10,000 to improve, protect and secure this canal, this court can have no power to require it to be filled up and obstructed.   While the engineering officers of the Government are, under the authority of Congress, doing all they can to make this canal useful to commerce and to keep it in good condition, this court can owe no duty to a State which requires it to order the city of Duluth to destroy it.

"These views show conclusively that the State of Wisconsin is not entitled to the relief asked by the bill, and that it must, therefore, be dismissed with costs."

The court, therefore, did not decline jurisdiction, but exercised it, by inquiring into the facts put in issue by the bill and answer, and by dismissing the bill for want of equity.

In *Virginia* v. *West Virginia*, 11 Wall. 39, a bill was filed in this court to settle the boundaries between the two States.

There was a demurrer to the bill. In delivering the opinion of the court Mr. Justice Miller said:

" The first proposition on which counsel insist, in support of the demurrer is, that this court has no jurisdiction of the case, because it involves the consideration of questions purely political; that is to say, that the main question to be decided is the conflicting claims of the two States to the exercise of political jurisdiction and sovereignty over the territory and inhabitants of the two countries which are the subject of dispute. This proposition cannot be sustained without reversing the settled course of decision in this court and overturning the principles on which several well-considered cases have been decided."

And, after citing *Rhode Island* v. *Massachusetts*, 12 Pet. 651; *Missouri* v. *Iowa*, 7 How. 660; *Florida* v. *Georgia*, 17 How. 478, and *Alabama* v. *Georgia*, 23 How. 505, the conclusion of the court was thus expressed:

" We consider, therefore, the established doctrine of this court to be that it has jurisdiction of questions of boundary between two States of this Union, and that this jurisdiction is not defeated because in deciding that question it becomes necessary to examine into and construe compacts and agreements between those States, or because the decree which the court may render affects the territorial limits of the political jurisdiction and sovereignty of the States which are parties to the proceeding."

In *New Hampshire* v. *Louisiana and Others*, and *New York* v. *Louisiana and Others*, 108 U. S. 76, it was found that, in view of the Eleventh Amendment to the Constitution of the United States, declaring, that " the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens and subjects of any foreign State," as matter of fact, under the pleadings and testimony, the suits were commenced and were prosecuted solely by the owners of the bonds and coupons, to collect which was the object of the suits, and it was accordingly held " that the evident purpose of the amendment, so promptly proposed and finally adopted, was to prohibit all suits against a State by or for citizens of other States or aliens, without the consent of the

State to be sued, and, in our opinion, one State cannot create a controversy with another State, within the meaning of that term as used in the judicial clauses of the Constitution, by assuming the prosecution of debts, owing by the other State to its citizens. Such being the case we are satisfied that we are prohibited, both by the letter and the spirit of the Constitution, from entertaining these suits, and the bill in each case is dismissed."

In *Wisconsin* v. *Pelican Insurance Company*, 127 U. S. 265, 286, the nature of the case and of the question involved was thus stated by Mr. Justice Gray, in delivering the opinion of the court:

"This action is brought upon a judgment recovered by the State of Wisconsin in one of her own courts against the Pelican Insurance Company, a Louisiana corporation, for penalties imposed by a statute of Wisconsin for not making returns to the insurance commissioner of the State, as required by that statute. The leading question argued at the bar is whether such an action is within the original jurisdiction of this court.

"The ground on which the jurisdiction is invoked is not the nature of the cause, but the character of the parties, the plaintiff being one of the States of the Union, and the defendant a corporation of another of the States."

After citing and considering the cases, the justice expressed the following conclusions:

"The rule that the courts of no country execute the penal laws of another applies not only to prosecutions and sentences for crimes and misdemeanors, but to all suits in favor of the State for the recovery of pecuniary penalties for any violation of statutes for the protection of its revenue, or other municipal laws, and to all judgments for such penalties. . . . From the first organization of the courts of the United States, nearly a century ago, it has always been assumed that the original jurisdiction of this court over controversies between a State and citizens of another State, or of a foreign country, does not extend to a suit by a State to recover penalties for a breach of her own municipal law. . . . The statute of Wisconsin, under which the State recovered in one of her own courts the

judgment now and here sued on, was in the strictest sense a penal statute, imposing a penalty upon any insurance company of another State, doing business in the State of Wisconsin without having deposited with the proper officer of the State a full statement of its property and business during the previous year. The cause of action was not any private injury, but solely the offence committed against the State by violating her law. . . . This court, therefore, cannot entertain an original action to compel the defendants to pay to the State of Wisconsin a sum of money in satisfaction of the judgment for that fine."

And consequently judgment was entered for the defendant on the demurrer that had been interposed to the declaration.

*Hans* v. *Louisiana*, 134 U. S. 1, was an action brought in the Circuit Court of the United States for the Eastern District of Louisiana, against the State of Louisiana, by Hans, a citizen of that State, to recover the amount of certain coupons annexed to bonds of the State. The Circuit Court, on motion of the attorney general of the State, dismissed the case for want of jurisdiction. This court affirmed the judgment of the Circuit Court, and held that the judicial power of the United States did not extend to the case of a suit brought against a State by one of its own citizens.

In the course of the opinion, delivered by Mr. Justice Bradley, the following observations were made:

"The truth is, that the cognizance of suits and actions unknown to the law, and forbidden by the law, was not contemplated by the Constitution when establishing the judicial power of the United States. Some things, undoubtedly, were made justiciable which were not known as such at the common law; such, for example, as controversies between States as to boundary lines, and other questions admitting of judicial solution. And yet the case of *Penn* v. *Lord Baltimore*, 1 Vesey, Sen. 444, shows that some of these unusual subjects of litigation were not unknown to the courts even in colonial times; and several cases of the same general character arose under the Articles of Confederation, and were brought before the tribunal provided for that purpose by those articles. 131 U. S. App. 1. The establishment of this new branch of jurisdiction seemed to be

necessary from the extinguishment of diplomatic relations between the States. Of other controversies between a State and another State or its citizens, which, on the settled principles of public law, are not subjects of judicial cognizance, this court has often declined to take jurisdiction. See *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 288, 289, and cases there cited."

The last case which we have had occasion to examine is that of *Louisiana* v. *Texas*, 176 U. S. 1, 16. The case was brought before us by a bill in equity, filed by the State of Louisiana against the State of Texas, her Governor and her health officer. The bill alleged that the State of Texas had granted to its Governor and its health officer extensive powers over the establishment and maintenance of quarantines over infectious and contagious diseases; that this power had been exercised in a way and with a purpose to build up and benefit the commerce of cities in Texas, which were business rivals of the city of New Orleans, and prayed for a decree that neither the State of Texas, nor her Governor, nor her health officer, have the right, under the cover of an exercise of police or quarantine powers, to declare and enforce an embargo against interstate commerce between the State of Louisiana, or any part thereof, and the State of Texas, or the right to make discriminative rules affecting the State of Louisiana, or any part thereof, and different from and more burdensome than the quarantine rules and regulations applied to other States and countries; and the bill asked for an injunction restraining the Texas officials from enforcing the Texas laws in the manner in which they were enforced. To this bill a demurrer was filed, assigning the following causes :

" First. That this court has no jurisdiction of either the parties to or of the subject-matter of this suit, because it appears from the face of the bill that the matters complained of do not constitute, within the meaning of the Constitution of the United States, any controversy between the States of Louisiana and Texas. Second. Because the allegations of the bill show that the only issues presented by said bill arise between the State of Texas or her officers, and certain persons in the city of New Orleans, in the State of Louisiana, who were engaged in inter-

state commerce, and which do not in any manner concern the State of Louisiana as a corporate body or State. Third. Because such bill shows upon its face that this suit is in reality for and on behalf of certain individuals engaged in interstate commerce, and while the suit is attempted to be prosecuted for and in the name of the State of Louisiana, said State is in effect loaning its name to said individuals and is only a nominal party ——the real parties at interest being said individuals in the city of New Orleans who are engaged in interstate commerce. Fourth. Because it appears from the face of said bill that the State of Louisiana, in her right of sovereignty, is seeking to maintain this suit for the redress of the supposed wrongs of her citizens in regard to interstate commerce, while under the constitution and laws the said State possesses no such sovereignty as empowers her to bring an original suit in this court for such purpose. Fifth. Because it appears from the face of the bill that no property rights of the State of Louisiana are in any manner affected by the quarantine complained of, nor is any such property right involved in this suit as would give this court original jurisdiction of this cause."

In the opinion of the court, delivered by Mr. Chief Justice Fuller, after a consideration of the cases hereinbefore mentioned and of others, it was said :

"In order then to maintain jurisdiction of this bill of complaint, as against the State of Texas, it must appear that the controversy to be determined is a controversy arising directly between the State of Louisiana and the State of Texas, and not a controversy in the vindication of grievances of particular individuals.

"By the Constitution the States are forbidden to enter into any treaty, alliance or confederation ; grant letters of marque and reprisal, or, without the consent of Congress, 'keep troops or ships of war in time of peace, enter into any agreement or compact with another State, or with a foreign power, or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay.'

"Controversies between them arising out of public relations and intercourse cannot be settled either by war or diplomacy,

though, with the consent of Congress, they may be composed by agreement.   .   .   .

"In the absence of agreement it may be that a controversy might arise between two States for the determination of which the original jurisdiction of this court would be invoked, but there must be a direct issue between them, and the subject-matter must be susceptible of judicial solution.   And it is difficult to conceive of a direct issue between two States in respect of a matter where no effort at accommodation has been made ; nor can it be conceded that it is within the judicial function to inquire into the motives of a state legislature in passing a law, or of the chief magistrate of a State in enforcing it in the exercise of his discretion and judgment.   Public policy forbids the imputation to authorized official action of any other than legitimate motives.   .   .   .

" But in *Debs, Petitioner*, 158 U. S. 564, involving a case in the Circuit Court, in which the United States had sought relief by injunction, it was observed : ' That while it is not the province of the Government to interfere in any mere matter of private controversy between individuals, or to use its great powers to enforce the rights of one against another, yet, whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the Constitution are entrusted to the care of the nation, and concerning which the nation owes its duty to all the citizens of securing to them their common rights, then the mere fact that the Government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts or prevent it from taking measures therein to fully discharge those constitutional duties.'

" It is in this aspect that the bill before us is framed.   Its gravamen is not a special and peculiar injury such as would sustain an action by a private person, but the State of Louisiana presents herself in the attitude of *parens patriæ*, trustee, guardian or respresentative of all her citizens.   She does this from the point of view that the State of Texas is intentionally absolutely interdicting interstate commerce as respects the State of Louisiana by means of unncessary and unreasonable quarantine regulations.   Inasmuch as the vindication of the freedom of in-

terstate commerce is not committed to the State of Louisiana, and that State is not engaged in such commerce, the cause of action must be regarded not as involving any infringement of the powers of the State of Louisiana, or any special injury to her property, but as asserting that the State is entitled to relief in this way because the matters complained of affect her citizens at large.    Nevertheless if the case stated is not one presenting a controversy between these States, the exercise of original jurisdiction by this court as against the State of Texas cannot be maintained."

After quoting the provisions of the statute of the State of Texas regulating the subject of quarantine, the Chief Justice proceeded to say :

"It is not charged that this statute is invalid, nor could it be if tested by its terms.    While it is true that the power vested in Congress to regulate commerce among the States is a power complete in itself, acknowledging no limitations other than those prescribed in the Constitution, and that where the action of the States in the exercise of their reserved powers comes into collision with it, the latter must give way, yet it is also true that quarantine laws belong to that class of state legislation which is valid until displaced by Congress, and that such legislation has been expressly recognized by the laws of the United States almost from the beginning of the government. . . .    The complaint here, however, is not that the laws of Texas in respect of quarantine are invalid, but that the health officer, by rules and regulations framed and put in force by him thereunder, places an embargo in fact on all interstate commerce between the State of Louisiana and the State of Texas, and that the Governor permits these rules and regulations to stand and be enforced, although he has the power to modify or change them.    The bill is not rested merely on the ground of the imposition of an embargo without regard to motive, but charges that the rules and regulations are more stringent than called for by the particular exigency, and are purposely framed with the view to benefit the State of Texas, and the city of Galveston in particular, at the expense of the State of Louisiana, and especially of the city of New Orleans.

" But in order that a controversy between States, justiciable in this court, can be held to exist, something more must be put forward than that the citizens of one State are injured by the maladministration of the laws of another. The States cannot make war, or enter into treaties, though they may, with the consent of Congress, make compacts and agreements. Where there is no agreement, where breach might create it, a controversy between States does not arise unless the action complained of is state action, and acts of state officers in abuse or excess of their powers cannot be laid hold of as in themselves committing one State to a distinct collision with a sister State.

" In our judgment, this bill does not set up facts which show that the State of Texas has so authorized or confirmed the alleged action of her health officer as to make it her own, or from which it necessarily follows that the two States are in controversy within the meaning of the Constitution.

" Finally, we are unable to hold that the bill may be maintained as presenting a case of controversy ' between a State and citizens of another State.' Jurisdiction over controversies of that sort does not embrace the determination of political questions, and, where no controversy exists between States, it is not for this court to restrain the Governor of a State in the discharge of his executive functions in a matter lawfully confided to his discretion and judgment. Nor can we accept the suggestion that the bill can be maintained as against the health officer alone on the theory that his conduct is in violation or in excess of a valid law of the State, as the remedy for that would clearly lie with the state authorities, and no refusal to fulfil their duty in that regard is set up. In truth it is difficult to see how on this record there could be a controversy between the State of Louisiana and the individual defendants without involving a controversy between the States, and such a controversy, as we have said, is not presented."

Accordingly the demurrer was sustained and bill dismissed.

From the language of the Constitution, and from the cases in which that language has been considered, what principles may be derived as to the nature and extent of the original jurisdiction of this court in controversies between two or more States ?

From the language, alone considered, it might be concluded that whenever, and in all cases where one State may choose to make complaint against another, no matter whether the subject of complaint arises from the legislation of the defendant State, or from acts of its officers and agents, and no matter whether the nature of the injury complained of is to affect the property rights or the sovereign powers of the complaining State, or to affect the rights of its citizens, the jurisdiction of this court would attach.

Chief Justice Marshall in the case of *Cohens* v. *Virginia*, 6 Wheat. 264, 392, said:

"The Constitution gives the Supreme Court original jurisdiction in certain enumerated cases, and gives it appellate jurisdiction in all others. Among those in which jurisdiction must be exercised in the appellate form are cases arising under the Constitution and laws of the United States. These provisions of the Constitution are equally obligatory, and are to be equally respected. If a State be a party, the jurisdiction of this court is original; if the case arise under a constitution or a law, the jurisdiction is appellate. But a case to which a State is a party may arise under the Constitution or a law of the United States. What rule is applicable to such a case? What, then, becomes the duty of the court? Certainly, we think, so to construe the Constitution as to give effect to both provisions, as far as possible to reconcile them, and not to permit their seeming repugnancy to destroy each other. We must endeavor so to construe them as to preserve the true intent and meaning of the instrument.

"In one description of cases the jurisdiction of the court is founded entirely on the character of the parties; and the nature of the controversy is not contemplated by the Constitution. The character of the parties is everything, the nature of the case nothing. In the other description of cases the jurisdiction is founded entirely on the character of the case, and the parties are not contemplated by the Constitution. In these the nature of the case is everything, the character of the parties nothing. When, then, the Constitution declares the jurisdiction, in cases where a State shall be a party, to be original, and in all cases

arising under the Constitution or a law to be appellate, the con-
clusion seems irresistible that its framers designed to include in
the first class those cases in which jurisdiction is given, because
a State is a party ; and to include in the second those in which
jurisdiction is given, because the case arises under the Consti-
tution or a law."

But it must be conceded that upon further consideration, in
cases arising under different states of facts, the general language
used in *Cohens* v. *Virginia*, has been, to some extent, modified.
Thus, in the cases of *New Hampshire* v. *Louisiana*, and *New
York* v. *Louisiana*, *ut supra*, jurisdiction was denied to this
court where the cause of action belonged to private persons,
who were endeavoring to use the name of one State to enforce
their rights of action against another. Though, perhaps, it
may be said that jurisdiction was really entertained, and that
the bills were dismissed, because the court found that, under
the pleadings and testimony, the State's complainant had no
interest of any kind in the proceedings.

So, too, in *Wisconsin* v. *Pelican Insurance Company*, *ut
supra*, the court held that, notwithstanding the action was
brought by a State against the citizens of another State and
was thus within the letter of the Constitution, yet that the
court had a right to inquire into the nature of the case, and,
when it found that the object of the suit was to enforce the
penal laws of one State against a citizen of another, to refuse
to exercise jurisdiction.

In the case of *Louisiana* v. *Texas*, *ut supra*, the bill was dis-
missed because a controversy between the two States was not
actually presented ; that what was complained of was not any
action of the State of Texas, but the alleged unauthorized conduct
of its health officer, acting with a malevolent purpose against the
city of New Orleans. Here again it may be observed that the
court did not decline jurisdiction, but exercised it in holding
that the facts alleged in the bill did not justify the court in
granting the relief prayed for.

The cases cited show that such jurisdiction has been exercised
in cases involving boundaries and jurisdiction over lands and
their inhabitants, and in cases directly affecting the property

rights and interests of a State. But such cases manifestly do not cover the entire field in which such controversies may arise, and for which the Constitution has provided a remedy; and it would be objectionable, and, indeed, impossible, for the court to anticipate by definition what controversies can and what cannot be brought within the original jurisdiction of this court.

An inspection of the bill discloses that the nature of the injury complained of is such that an adequate remedy can only be found in this court at the suit of the State of Missouri. It is true that no question of boundary is involved, nor of direct property rights belonging to the complainant State. But it must surely be conceded that, if the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them. If Missouri were an independent and sovereign State all must admit that she could seek a remedy by negotiation, and, that failing, by force. Diplomatic powers and the right to make war having been surrendered to the general government, it was to be expected that upon the latter would be devolved the duty of providing a remedy and that remedy, we think, is found in the constitutional provisions we are considering.

The allegations of the bill plainly present such a case. The health and comfort of the large communities inhabiting those parts of the State situated on the Mississippi River are not alone concerned, but contagious and typhoidal diseases introduced in the river communities may spread themselves throughout the territory of the State. Moreover substantial impairment of the health and prosperity of the towns and cities of the State situated on the Mississippi River, including its commercial metropolis, would injuriously affect the entire State.

That suits brought by individuals, each for personal injuries, threatened or received, would be wholly inadequate and disproportionate remedies, requires no argument.

It is further contended, in support of the demurrer, that even if the State of Missouri be the proper party to file such a bill, yet that the proper defendant is the Sanitary District of Chicago solely, and that the State of Illinois should not have been made a party, and that, as to her, the demurrer ought to be sustained.

It can scarcely be supposed, in view of the express provisions of the Constitution and of the cited cases, that it is claimed that the State of Illinois is exempt from suit because she is a sovereign State which has not consented to be sued. The contention rather seems to be that, because the matters complained of in the bill proceed and will continue to proceed from the acts of the Sanitary District of Chicago, a corporation of the State of Illinois, it therefore follows that the State, as such, is not interested in the question, and is improperly made a party.

We are unable to see the force of this suggestion. The bill does not allege that the Sanitary District is acting without or in excess of lawful authority. The averment and the conceded facts are that the corporation is an agency of the State to do the very things which, according to the theory of the complainant's case, will result in the mischief to be apprehended. It is state action and its results that are complained of—thus distinguishing this case from that of *Louisiana* v. *Texas*, where the acts sought to be restrained were alleged to be those of officers or functionaries proceeding in a wrongful and malevolent misapplication of the quarantine laws of Texas. The Sanitary District of Chicago is not a private corporation, formed for purposes of private gain, but a public corporation, whose existence and operations are wholly within the control of the State.

The object of the bill is to subject this public work to judicial supervision, upon the allegation that the method of its construction and maintenance will create a continuing nuisance, dangerous to the health of a neighboring State and its inhabitants. Surely, in such a case, the State of Illinois would have a right to appear and traverse the allegations of the bill, and, having such a right, might properly be made a party defendant.

It is further contended that, even if this court has original jurisdiction of the subject-matter, and even if the respective States have been properly made parties, yet the case made out by the bill does not entitle the State of Missouri to the equitable relief prayed for.

This proposition is sought to be maintained by several considerations. In the first place, it is urged that the drawing, by artificial means, of the sewage of the city of Chicago into the

Mississippi River may or may not become a nuisance to the inhabitants, cities and towns of Missouri; that the injuries apprehended are merely eventual or contingent, and may, in fact, never be inflicted. Can it be gravely contended that there are no preventive remedies, by way of injunction or otherwise, against injuries not inflicted or experienced, but which would appear to be the natural result of acts of the defendant, which he admits or avows it to be his intention to commit?

The bill charges that the acts of the defendants, if not restrained, will result in the transportation, by artificial means and through an unnatural channel, of large quantities of undefecated sewage daily, and of accumulated deposits in the harbor of Chicago and in the bed of the Illinois River, which will poison the water supply of the inhabitants of Missouri and injuriously affect that portion of the bed or soil of the Mississippi River which lies within its territory.

In such a state of facts, admitted by the demurrer to be true, we do not feel it necessary to enter at large into a discussion of this part of the defendants' contention, but think it sufficient to cite one or two authorities.

*Attorney General* v. *Jamaica Pond Aqueduct Corporation,* 133 Mass. 361, was a proceeding in equity in the Supreme Judicial Court to enjoin the defendants from lowering the water in one of the public ponds of Massachusetts. It was claimed that the necessary effect of such lowering would be to impair the rights of the people in the use of the pond for fishing, boating and other lawful purposes, and to create and expose upon the shores of the pond a large quantity of slime, mud and offensive vegetation, detrimental to the public health. The defendants demurred, claiming that no case was stated which came within the equity jurisdiction of the court, and questioning the power of the attorney general, on behalf of the Commonwealth, to maintain the proceedings. Speaking for the court, the Chief Justice said:

"The cases are numerous in which it has been held that the attorney general may maintain an information in equity to restrain a corporation exercising the right of eminent domain under a power delegated to it by the legislature, from any abuse

or perversion of the powers which may create a public nuisance or injuriously affect or endanger the public interests,"—citing many cases, and proceeding:

"The information in this case alleges not only that the defendant is doing acts which are *ultra vires* and an abuse of the power granted to it by the legislature, but also that the necessary effect of said acts will be to create a public nuisance. This brings the case within the established principle that the court has jurisdiction in equity to restrain and prevent nuisances. And when the nuisance is a public one an information by the attorney general is the appropriate remedy. This information, therefore, can be sustained on the ground that the unlawful acts of the defendant will produce a public nuisance by partially draining the pond and exposing its shores, thus endangering the public health."

And replying to the claim that resort to equity was unnecessary, the court further said:

"The defendant contends that the law furnishes a plain, adequate and complete remedy for this nuisance by an indictment or by proceedings under the statutes for the abatement of a nuisance by the board of health. Neither of these remedies can be invoked until a part of the mischief is done, and they could not, in the nature of things, restore the pond, the land and the underground currents to the same condition in which they now are. In other words, they could not remedy the whole mischief. The preventive force of a decree in equity, restraining the illegal acts before any mischief is done, gives clearly a more efficacious and complete remedy."

The nature of equitable remedy in the case of public nuisances was well described by Mr. Justice Harlan, speaking for the court in the case of *Mugler* v. *Kansas*, 123 U. S. 623, 673:

"The grounds of this jurisdiction, in cases of purpresture, as well as of public nuisances, is the ability of courts of equity to give a more speedy, effectual and permanent remedy than can be had at law. They cannot only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and by perpetual injunction protect the public against them in the future; whereas courts of law

can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals or safety of the community."

In *Coosaw Mining Co.* v. *South Carolina*, 144 U. S. 550, it was said by this court, through Mr. Justice Harlan, after citing English and American cases:

"Proceedings at law or by indictment can only reach past or present wrongs done by appellant, and will not adequately protect the public interests in the future. What the public are entitled to have is security for all time against illegal interference with the control by the State of the digging, mining and removing of phosphate rock and phosphate deposits in the bed of Coosaw River."

It is finally contended that, if the bill was not prematurely filed, then it was filed too late; that, by standing by for so long a period, the complainant was guilty of such laches that a court of equity will not grant relief.

The inconsistency between these contentions is manifest, and on consideration, we are of opinion that the suggestion that the complainant's remedy has been lost by delay, is not founded in fact or reason.

In *Goldsmid* v. *Tunbridge Wells Commissioners*, L. R. 1 Eq. 161, answering a similar contention, it was said by Romilly, M. R.:

"If the plaintiff comes to the court and complains very early, then the evidence is that the pollution is not preceptible, it is wholly inappreciable, and you get evidence after evidence for the defendants, (the pollution being slight and perhaps only observable at some times and on some occasions,) saying you have no proof at all that there is any appreciable pollution, and you must wait until it becomes a nuisance. Then he waits for five or six years, until it is obvious to everybody's sense that the pollution is considerable, and then they say 'you have come too late, you have allowed this to continue on for twenty years, and we have acquired an easement over your property, and the right of pouring the sewage into it.' My opinion is that any person who has a water course flowing through his

land, and sewage which is preceptible is brought into that water course, has a right to come here to stop it; and that when the pollution is increasing, and gradually increasing from time to time, by the additional quantity of sewage poured into it, the persons who allow the polluted matter to flow into the stream are not at liberty to claim any right or prescription against him. . . .

"This is a matter of very great importance, and it has been suggested to me in argument as a matter that ought to be regarded that private interests must give way to public interests; that the court ought to regard what the advantage to the public is, and that some little sacrifice ought to be made by private individuals. I do not assent to that view of the law on the subject, and I apprehend that the observations which were quoted to me of Vice Chancellor Sir William Page Wood, in the *Attorney General* v. *The Mayor of Kingston,* 13 W. R. 888, are perfectly accurate, and that private rights are not to be interfered with. But my firm conviction is that in this, as in all the great dispensations and operations of nature, the interests of the individuals are not only compatible with but identical with the interests of the public; and although in this case I have only to consider an injury to the private individual, the plaintiff in the present action, yet I believe that the injury to the public may be extremely great by polluting a stream which flows for a considerable distance, the water of which cattle are in the habit of drinking, the exhalations from which persons who reside on the banks must necessarily inhale, and this at a time when the attention of the people and the court is necessarily called to the fact that the most scientific men who have examined the subject are unable to say whether great diseases among cattle and contagious diseases affecting human beings, such as cholera or typhus, and the like, may not in a great measure be communicated or aggravated by the absorption of particles of feculent matter into the system, which are either inappreciable or scarcely appreciable by the most minute chemical analysis. It is impossible in that state of things to say what amount of injury may be done by polluting even partially a stream which flows a considerable distance. I am of opinion

that Mr. Goldsmid was not bound to remain quiet until this stream had become such a nuisance that it was obvious to everybody near its banks; and the result is that in my opinion he is entitled to a decree for an injunction to restrain the defendants from causing or permitting the sewage and other offensive matters from the town of Tunbridge Wells to be discharged into the Calverly Brook, or stream, in such a manner as to affect the waters of the brook as it flows through the plaintiff's land."

This decree of the Master of the Rolls was subsequently affirmed on appeal.  L. R. 1 Ch. App. 349.

Similar views prevailed in *Chapman* v. *Rochester*, 110 N. Y. 273, where a bill was filed to enjoin the defendant city from polluting, by the discharge of sewage by artificial means, a natural stream flowing through his lands.

In the opinion of the New York Court of Appeals, it was said by Danforth, J., after citing *Goldsmid* v. *Tunbridge Wells:*

"In view of the principle upon which these and like decisions turn, the objections of the learned counsel for the defendant against the judgment appealed from are quite unimportant. The filth of the city does not flow naturally to the lands of the plaintiff, as surface water finds its level, but is carried thither by artificial arrangements, prepared by the city, and for which it is responsible.  Nor is the plaintiff estopped by acquiescence in the proceedings of the city in devising and carrying out its sewerage system.  The principle invoked by the appellant has no application.  It does not appear that the plaintiff in any way encouraged the adoption of that system, or by any act or word induced the city authorities to so direct the sewers that the flow from them should reach his premises.  There is no finding to that effect, and the record contains no evidence.  In fine, the case comes within the general rule, which gives to a person injured by the pollution of air or water, to the use of which, in its natural condition, he is entitled, an action against the party, whether it be a natural person or corporation who causes that pollution."

Cases cited by defendants' counsel, where injunctions were refused to aid in the suppression of public nuisances, were cases where the act complained of was fully completed, and where

the nuisance was not one resulting from conduct repeated from day to day. Most of them were cases of purpresture, and concerned permanent structures already existing when courts in equity were appealed to.

The bill in this case does not assail the drainage canal as an unlawful structure, nor aim to prevent its use as a waterway. What is sought is relief against the pouring of sewage and filth through it, by artificial arrangements, into the Mississippi River, to the detriment of the State of Missouri and her inhabitants, and the acts are not merely those that have been done, or which when done cease to operate, but acts contemplated as continually repeated from day to day. The relief prayed for is against not merely the creation of a nuisance but against its maintenance.

Our conclusion, therefore, is that the demurrers filed by the respective defendants cannot be sustained. We do not wish to be understood as holding that, in a case like the present one, where the injuries complained of grow out of the prosecution of a public work, authorized by law, a court of equity ought to interpose by way of preliminary or interlocutory injunction, when it is denied by answer that there is any reasonable foundation for the charges contained in the bill. We are dealing with the case of a bill alleging, in explicit terms, that damage and irreparable injury will naturally and necessarily be occasioned by acts of the defendants, and where the defendants have chosen to have their rights disposed of, so far as the present hearing is concerned, upon the assertions of this bill.

We fully agree with the contention of defendants' counsel that it is settled that an injunction to restrain a nuisance will issue only in cases where the fact of nuisance is made out upon determinate and satisfactory evidence; that if the evidence be conflicting and the injury be doubtful, that conflict and doubt will be a ground for withholding an injunction; and that, where interposition by injunction is sought, to restrain that which is apprehended will create a nuisance of which its complainant may complain, the proofs must show such a state of facts as will manifest the danger to be real and immediate.

But such observations are not relevant to the case as it is now before us.

*The demurrers are overruled, and leave is given to the defendants to file answers to the bill.*

MR. CHIEF JUSTICE FULLER, with whom concurred MR. JUSTICE HARLAN and MR. JUSTICE WHITE, dissenting:

Controversies between the States of this Union are made justiciable by the Constitution because other modes of determining them were surrendered; and before that jurisdiction, which is intended to supply the place of the means usually resorted to by independent sovereignties to terminate their differences, can be invoked, it must appear that the States are in direct antagonism as States. Clearly this bill makes out no such state of case.

If, however, on the case presented, it was competent for Missouri to implead the State of Illinois, the only ground on which it can be rested is to be found in the allegation that its Governor was about to authorize the water to be turned into the drainage channel.

The Sanitary District was created by an act of the General Assembly of Illinois, and the only authority of the State having any control and supervision over the channel is that corporation. Any other control or supervision lies with the law-making power of the State of Illinois, and I cannot suppose that complainant seeks to coerce that. It is difficult to conceive what decree could be entered in this case which would bind the State of Illinois or control its action.

The Governor, it is true, was empowered by the act to authorize the water to be let into the channel on the receipt of a certificate, by commissioners appointed by him to inspect the work, that the channel was of the capacity and character required. This was done, and the water was let in on the day when the application was made to this court for leave to file the bill. The Governor had discharged his duty, and no official act of Illinois, as such, remained to be performed.

Assuming that a bill could be maintained against the Sanitary

District in a proper case, I cannot agree that the State of Illinois would be a necessary or proper party, or that this bill can be maintained against the corporation as the case stands.

The act complained of is not a nuisance, *per se*, and the injury alleged to be threatened is contingent. As the channel has been in operation for a year, it is probable that the supposed basis of complaint can now be tested. But it does not follow that the bill in its present shape should be retained.

In my opinion both the demurrers should be sustained, and the bill dismissed, without prejudice to a further application, as against the Sanitary District, if authorized by the State of Missouri.

My brothers HARLAN and WHITE concur with me in this dissent