# PEOPLE OF THE STATE OF NEW YORK *v.* STATE OF NEW JERSEY AND PASSAIC VALLEY SEWERAGE COMMISSIONERS.

## IN EQUITY.

No. 2, Original. Argued November 8, 11, 12, 1918; restored to docket for further argument March 10, 1919; reargued January 25, 1921.—Decided May 2, 1921.

New York brought this suit against New Jersey and the Passaic Valley Sewerage Commissioners, to enjoin the execution of a project to convey the sewage of the Passaic Valley through a sewer system and to discharge it into a part of New York Harbor, known as the Upper New York Bay, the plaintiff alleging that the sewage would be carried by the currents and tides into the Hudson and East Rivers and be deposited on the bottom and shores of the Bay and upon and adjacent to the wharves and docks of New York City, and would so pollute the water as to render it a public nuisance, offensive and injurious to persons living near it or using it for bathing or for purposes of commerce, damaging to vessels using the waters, and so poisonous to fish and oysters in it as to render them unfit for food. The United States intervening opposed the plan as threatening, unnecessarily, obstruction of navigable channels, injury to the health of persons navigating the waters and of officials and employees at a navy yard, and damage to government property bordering on the Bay; but withdrew, without prejudice, upon the filing of a stipulation executed by its Attorney General, and by the defendant sewer commissioners acting under authority of an act of the New Jersey legislature, agreeing upon a modification of the method proposed for purifying and dispersing the sewage, specifying the results that must be secured thereby or through requisite additional lawful arrangements, allowing the Government full opportunity to inspect the workings of the sewer system and providing that compliance with the stipulation should be made a condition of any permit issued by the Government for construction, maintenance or operation. The case having proceeded to final hearing between the original parties,—

*Held:* (1) That the right of New York to maintain such a suit on behalf of her citizens was clear, without regard to the precise lo-

cation of the boundary between the two States or to New York's claim of jurisdiction over the waters of New York Bay. P. 301.

(2) That the defendant Sewerage Commissioners constituted a statutory, corporate agency of New Jersey, whose acts and intentions in the premises must be treated as those of the State. P. 302.

(3) That, if the conditions of the stipulation were realized and maintained, there could be no occasion for the injunction prayed for. P. 305.

(4) That the stipulation was binding on New Jersey and the United States. P. 307.

(5) That the evidence must be considered subject to the principle that, before this court will exercise its extraordinary power to control the conduct of one State at the suit of another, the threatened invasion of rights must be of serious magnitude and established by clear and convincing evidence. P. 309.

(6) That the evidence failed to prove that the proposed addition of sewage would cause increased damage to hulls of vessels or danger of air-borne disease to persons navigating or dwelling along the water, or (if treated as proposed in the stipulation) damage to persons bathing, or fish or oysters subsisting, in the water, additional to that attributable to existing discharge of sewage from New York City and its environs. P. 309.

(7) That, as to the question remaining, the evidence failed to show with the requisite certainty, that, even if treated only as specifically prescribed in the stipulation, the additional sewage would create a public nuisance by causing offensive odors, or unsightly deposits on the surface, or seriously add to the existing pollution; and that, therefore, and in view of improved methods of sewage treatment disclosed by the testimony and of the right of the Government to stop the operation of the sewer if it caused pollution of the Bay, the injunction must be refused. P. 310.

The court suggests that the problem involved in this case is one more likely to be wisely solved by coöperative study and by conference and mutual concession on the part of the States interested than by proceedings in any court. P. 313.

Bill dismissed without prejudice.

THIS original case was first argued at the October Term of 1918, but, owing in part to the time that had then elapsed since the closing of the evidence, the court found it necessary to direct the taking of additional testimony on certain specified points. See 249 U. S. 202. The

facts are reviewed in the opinion. No attempt is made to reproduce the arguments which were mainly concerned with the matters of fact involved.

*Mr. Charles E. Hughes,* with whom *Mr. Charles D. Newton,* Attorney General of the State of New York, *Mr. William J. O'Sullivan, Mr. Russell Lord Tarbox* and *Mr. Allen S. Hubbard* were on the brief, for complainant.[1]

*Mr. Adrian Riker* and *Mr. George W. Wickersham,* with whom *Mr. Thomas F. McCran,* Attorney General of the State of New Jersey, and *Mr. Robert H. McCarter* were on the brief, for defendants.[1]

MR. JUSTICE CLARKE delivered the opinion of the court.

The People of the State of New York, in their bill filed in this suit, pray that the defendants, the State of New Jersey and the Passaic Valley Sewerage Commissioners, be permanently enjoined from discharging, as it is averred they intend to discharge, a large volume of sewage into that part of New York Harbor known as the Upper Bay, for the reason, as it is alleged, that such pollution of the waters of the harbor will be caused thereby as to amount to a public nuisance, which will result in grave injury to the health, to the property, and to the commercial welfare, of the people of the State and City of New York.

The Passaic River rises in the northeasterly part of

_____

[1] At the first hearing, the case was argued by *Mr. Charles E. Hughes* on behalf of the complainant. *Mr. Merton E. Lewis,* Attorney General of the State of New York, and *Mr. William J. O'Sullivan* were on the brief. *Mr. Adrian Riker* and *Mr. Robert H. McCarter* argued on behalf of the defendants. *Mr. John W. Wescott,* Attorney General of the State of New Jersey, was on the brief.

New Jersey and empties into Newark Bay. High land separates its watershed from direct drainage into the Hudson River or New York Bay, and on the lower twenty-five miles of it there are located the cities of Paterson, Passaic, and Newark, and also a number of such large towns that the population upon and near to the river is treated throughout the record as approximately 700,000 in 1911, when it was thought the sewer would be completed, and as likely to be about 1,650,000 in 1940, to which year it was designed to furnish adequate sewerage capacity. These cities and towns, from their earliest settlement, had all drained their sewage into the river. The ebbing and flowing of the tide almost to Paterson delayed the escaping of this sewage from the river and resulted in the water becoming greatly polluted. This polluted water was emptied directly into Newark Bay, but, ultimately, 84% of it, modified, no doubt, by nature's agencies, but still polluted, found its way through the natural channel of Kill van Kull, into Upper New York Bay.

This drainage of sewage into the Passaic River resulted in the stream becoming such a menace to the health and property of the adjacent communities that, in 1896, a commission was appointed by the Governor of New Jersey, under the provisions of an act of the legislature, to study the problem presented, for the purpose of devising some system of sewage disposal which would afford relief. After this commission had reported, a second commission of investigation was provided for by act of the legislature in 1897, and its report was followed by a third similar commission in 1898.

The reports of these various commissions led, in 1902, to an act of the New Jersey legislature creating the Passaic Valley Sewerage District, with boundaries embracing substantially the entire watershed of the Passaic River, and to another act, in 1907, prohibiting the dis-

charge of sewage into the river after a date named, and directing the defendant Passaic Valley Sewerage Commissioners to prepare plans and specifications for a trunk sewer to dispose of the sewage and authorizing municipalities to contract with them for the service which they might require.

Under authority of this act, the defendant Sewerage Commissioners, in April, 1908, adopted a plan for sewage disposal, which provided for a main intercepting sewer, extending from the City of Paterson, along the right bank of the Passaic River, to a point in the City of Newark, and thence by a tunnel under the waters of Newark Bay and the cities of Bayonne and Jersey City to a point in Upper New York Bay about 500 feet north of Robbins Reef Light, where it was proposed to discharge the sewage at a depth of 40 feet of water below mean low tide. The estimated cost of the proposed sewer was $12,250,000.

It was provided in the act authorizing the construction of the sewer that, before any work should be undertaken or obligations incurred, a further investigation should be made by the Commissioners as to whether the discharge of the sewage into New York Bay would be likely to pollute its waters to such an extent as to cause a nuisance to persons or property within the State of New York, and that the result of such investigation, with the reasons for it, should be presented to the Governor of the State.

Such an investigation was made and upon report of the Commissioners the Governor concluded that the discharge of the sewage as proposed would not pollute the waters of New York Bay so as to cause a nuisance to either persons or property within the State of New York, and the Attorney General of the State also advised the Governor that in his opinion the State of New York could not have any valid legal objection to the use of the sewer as proposed.

There can be no doubt that the various commissioners

who investigated this subject were men of the highest character and intelligence and that they studied it with the aid of the best obtainable sanitary engineers, chemists and bacteriologists, for the purpose of arriving at a solution which would protect and preserve the interests of all of the great communities involved. It is equally beyond doubt that the Governor and other officials of New Jersey, with full appreciation of the magnitude and seriousness of the undertaking, proceeded with great caution and with a settled purpose to fully respect the rights of the people of the State of New York.

Learning of the plans of the State of New Jersey, thus detailed, the legislature of New York passed an act providing for a commission to investigate the probable effect upon the waters of New York Bay of the proposed Passaic Valley sewer, with power to coöperate with the authorities of New Jersey with a view to arriving at some mutually satisfactory solution of the problem. The record shows that various conferences were held between the New York Commission thus created and the Passaic Valley Sewerage Commissioners, but for some reason, which does not clearly appear, no mutually satisfactory course of action was arrived at, with the result that, in October, 1908, this suit for an injunction was commenced.

For the purpose of showing its right to maintain the suit, the bill thus filed sets out, with much detail, an agreement between the States of New York and New Jersey, approved by Congress in 1834, establishing the boundary line between the two States and giving to New York, to the extent therein written, exclusive jurisdiction over the waters of the Bay of New York.

But we need not inquire curiously as to the rights of the State of New York derived from this compact, for, wholly aside from it, and regardless of the precise location of the boundary line, the right of the State to maintain such a suit as is stated in the bill is very clear. The health,

comfort and prosperity of the people of the State and the value of their property being gravely menaced, as it is averred that they are by the proposed action of the defendants, the State is the proper party to represent and defend such rights by resort to the remedy of an original suit in this court under the provisions of the Constitution of the United States. *Missouri* v. *Illinois*, 180 U. S. 208, 241, 243; *Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230.

Also, for the purpose of showing the responsibility of the State of New Jersey for the proposed action of the defendant, the Passaic Valley Sewerage Commissioners, the bill sets out, with much detail, the acts of the legislature of that State authorizing and directing such action on their part.

Of this it is sufficient to say that the averments of the bill, quite undenied, show that the defendant sewerage commissioners constitute such a statutory, corporate agency of the State that their action, actual or intended, must be treated as that of the State itself, and we shall so regard it. 180 U. S. 208, *supra*.

The remaining essential allegations of the bill are that the defendants are about to construct the sewer we have described and to discharge the sewage thereby collected into the Upper New York Bay, through a single opening 12 feet in diameter, at a point about half a mile north of Robbins Reef Light; that there would be about 120 millions of gallons of such sewage discharged into the Bay every 24 hours in 1911, and in excess of 357 millions of gallons by 1940; that such sewage would be carried by the currents and tides into the Hudson and East Rivers and would be deposited on the bottom and shores of the Bay and upon and adjacent to the wharves and docks of New York City, thereby so polluting the water as to render it: a public nuisance offensive and injurious to persons living near it or using it for bathing or for purposes of commerce, damaging to vessels using the waters, and

so poisonous to the fish and oysters subsisting within it as to render them unfit for food. To prevent the public nuisance, which it is averred would thus be created, a permanent injunction was prayed for.

The essential denials and allegations of the answer are as follows:

Admitting their intention to construct the sewer substantially as described, it is averred: that New Jersey has a shore line of 25 miles on New York Bay and on the Hudson River, and that large cities and towns of that State border upon the Bay, so that it has as important an interest as New York has in maintaining the waters free from pollution; that the sewer project objected to was authorized only after it had been recommended and approved by sanitary engineers of highest professional standing and experience and upon their assurance, after careful study of the tidal flow and currents of the Bay, that appreciable pollution would not be caused thereby; that the Passaic River empties into Newark Bay and its water, charged, under existing conditions, with the sewage collected from the same communities intended to be served by the projected sewer, in large part reaches New York Bay in the vicinity of Robbins Reef Light, by natural channels, without causing substantial injury to the water; and that the City of New York has long been discharging into the Bay at or near to the shore lines thereof, daily, more than seven times as great a volume of sewage (entirely untreated) as the daily discharge of the proposed sewer would be for many years to come. The answer concludes with further denials that the waters of the Bay would be corrupted or their usefulness impaired by the use of the proposed intercepting sewer.

After the defendants had answered, the Government of the United States, by leave of court, filed a Petition of Intervention. The warrant assigned for this intervention was, the power and duty of the Government with respect

to navigation and interstate commerce, and the inherent power which it has to act for the protection of the health of government officials and employees at the Brooklyn navy yard, and its duty to protect from damage the Government property bordering upon New York Bay.

The projected sewer was described in this Petition of Intervention, substantially as in the original bill, but it was averred that the plans for the removal of solids from the sewage were so indefinite and inadequate that the use of the sewer would result in the obstruction of navigation by the filling up and shoaling of the channels of the Bay, and that the proposed purification of the sewage was so insufficient that the waters would be rendered unsightly and unhealthful to persons using them for commerce or dwelling upon the adjacent shores. It was averred that there were other, better and more advanced methods of sewage disposal than those proposed, and that the threatened injury to commerce and navigation, to the public health and to the property of the United States was not necessary. For these reasons the Government joined in the prayer for relief.

The coming of the Government into the case was followed by conferences between its officials and the Sewerage Commissioners, with the result that a method of treatment of the sewage was decided upon much more thorough, comprehensive and definite in character than had been adopted before and the manner of dispersion of it at the outlet was so changed as to secure a much greater diffusion, at a great depth in the adjacent waters.

These changes were ultimately embodied in a stipulation between the United States, acting through its Attorney General, and the Passaic Valley Sewerage Commissioners, acting under authority of a special act of the New Jersey legislature. It was agreed that upon the filing of this stipulation, properly executed, with the

Clerk of this Court, the Petition of Intervention of the Government should be dismissed, without prejudice—which was done on May 16, 1910.

The stipulation provides, with much detail, that at or near to a pumping station to be located in the Newark Meadows, near Newark Bay, the material coming from the trunk sewer shall first pass through coarse screens to remove floating matter; then through a grit basin or basins, to remove heavy matter, as far as practicable; then through self-cleaning mechanical screens, with openings of not over four-tenths of an inch; and then through sedimentation basins, equipped with "scum boards," at a prescribed velocity of flow. It is provided that the effluent thus screened and settled shall flow into a pumping well, whence it is to be pumped under pressure to a point near Robins Reef Light, where it is to be discharged at a depth of not less than forty feet beneath the surface of the water at mean low tide, through 150 outlets, distributed over an area of three and one-half acres, and so arranged as to drive the material horizontally across the tidal currents.

The terms of this stipulation were adopted by the Government under the advice of Army engineers of high rank and by the Sewerage Commissioners on the advice of distinguished sanitary engineers and it must be accepted as established by the testimony taken in 1919 that at that time screening and sedimentation and thorough dispersion in water through deeply submerged multiple outlets was regarded by the most competent authorities as the most approved method of disposing of sewage in large volume.

But, not satisfied with providing what was thought sufficient treatment to render the sewage innocuous, there was incorporated into the stipulation an agreement on the part of the Sewerage Commissioners that in the actual operation of the sewer at all times the following

results should be secured, either through compliance with the requirements of the stipulation for treatment of the sewage, "or through requisite lawful additional arrangements," viz: (1) There will be absence in the New York Bay of visible suspended particles coming from this sewage; (2) there will be absence of deposits caused by it objectionable to the Secretary of War of the United States; (3) there will be absence of odors due to the putrefaction of organic matter contained in the sewage; (4) there will be absence on the surface of the Bay of any grease or color due to the sewage; (5) there will be no injury to the public health due to the discharge of the sewage, and no public or private nuisance will be created thereby; (6) no injurious effect shall result to the property of the United States situated upon the Bay; (7) there shall not be a reduction in the dissolved oxygen content of the waters, due to this sewage, sufficient to interfere with major fish life. It is agreed that the Government shall have unrestricted opportunity to inspect the workings of the sewer system, by designated officials, and that full compliance at all times with the provisions of the stipulation referred to shall be made an express condition of any permit issued by the Government for the construction, maintenance or operation of the projected sewer system.

It is obvious that, if the conditions of this stipulation are realized and maintained, there will be no occasion or ground for such an injunction as was prayed for.

It is argued, however, and expert witnesses have testified, that the provisions therein stipulated for screening and sedimentation and final dispersion of the sewage in the water, are not sufficient to produce the results which the Sewerage Commissioners agree with the Government to produce and maintain, and that if such results as are feared by the witnesses are produced it would be impossible to determine whether they were caused by this

particular sewage or by that coming from other sources and that therefore the agreement would, in practice, be nugatory. But equally well informed and credible witnesses testified that the proposed treatment would·produce the stipulated results and that the source of such pollution, if any should be caused by the Passaic sewage, could readily be traced to its origin, and we think the probabilities greatly in favor of this conclusion, having regard to the opportunity secured to the Government for inspection and observation of the treatment plant and for determining the quality and content of effluent before it is discharged into the Bay and the effect which it may have·on the water in the immediate vicinity of the outlet.

It is also argued that this·stipulation is not binding upon the State of New Jersey because executed only by the Sewerage Commissioners, and that it is invalid for want of power in the Attorney General to so stipulate on behalf of the United States.

But since by act of its legislature the State of New Jersey specifically authorized the Sewerage Commissioners to execute the stipulation and by its special counsel entered of record its approval of, and consent to, it, we must and do regard it as the valid obligation of the State as certainly as of the Commissioners.

As to the United States: The intervention of the Government was allowed upon allegations that the inadequate treatment of the sewage proposed would result in injury to navigation and commerce: by causing deposits of solid matter, to the extent of thousands of tons annually, which would fill up and shallow the channels of the Bay; by rendering the Port of New York less serviceable and attractive to commerce and offensive and unwholesome to persons using and living near it; and by causing injury to the hulls of vessels by the character of the effluent to be discharged. It was also averred that

practically irreparable damage would be caused to extensive properties owned by the Government adjacent to the Bay.

Having regard to the large powers of the Government over navigation and commerce, its right to protect adjacent public property and its officers and employees from damage and disease, and to the duty and authority of the Attorney General to control and conduct litigation to which the Government may be a party (Rev. Stats., §§ 359, 367), we cannot doubt that the intervention of the Government was proper in this case and that it was within the authority of the Attorney General to agree that the United States should retire from the case upon the terms stated in the stipulation, which were plainly approved by the Secretary of War, who afterwards embodied them in the construction permit issued to the Sewerage Commissioners.

Although this stipulation was filed and the Government withdrew from the case on May 16, 1910, the remaining parties went forward and took a great volume of testimony, the taking of which was concluded in June, 1913. Five years passed before the case was brought on for argument at the October Term, 1918, and upon examination this court, having regard to the long time which had elapsed since the taking of testimony was closed and to the rapid advance in sanitary science then in progress, suggested in the record, directed that additional testimony should be taken in order that the court might be advised: (1) As to any practicable modification of the proposed sewer system which might improve it and reduce any polluting effect upon the water which might be caused by the effluent to be discharged; (2) as to any practicable plan or arrangement for sewage disposal which would lessen the polluting effect derived from the New York City sewage; (3) and as to the present degree of pollution of the waters of New York Harbor

and the change in this respect since the taking of the testimony was closed.

In compliance with this order much additional testimony was taken.

With the record in this state we come to consider the evidence introduced, but subject to the rule that the burden upon the State of New York of sustaining the allegations of its bill is much greater than that imposed upon a complainant in an ordinary suit between private parties. Before this court can be moved to exercise its extraordinary power under the Constitution to control the conduct of one State at the suit of another, the threatened invasion of rights must be of serious magnitude and it must be established by clear and convincing evidence. *Missouri* v. *Illinois,* 200 U. S. 496.

The water of New York Bay is such a brackish combination of salt sea and fresh water that it could not, under any circumstances, be used for drinking or other domestic purposes and, therefore, the reasons given in the bill to justify the injunction prayed for are restricted, as we have seen, to the claims that the addition of the Passaic Valley sewage to the already polluted waters of the Bay would result, in odors offensive and unwholesome to persons bathing in them or passing over them in large vessels or in small boats or living and working upon the adjacent shores, in causing unsightly deposits on the surface of the water and chemical action injurious to the wood and metal of vessels navigating the Bay, and in rendering fish and oysters taken from such waters unfit for consumption.

The evidence introduced, as to increase of damaging chemical action upon the hulls of vessels by the proposed addition of sewage, and as to danger from air-borne diseases to persons using the water in boats and vessels or working or dwelling upon the shore of the Bay, is much too meager and indefinite to be seriously considered as

ground for an injunction, and when it is considered that for many years all of the sewage from the great population of New York City and its environs and from the large cities on the New Jersey shore (estimated, in 1912, at 900 millions of gallons daily) has been discharged into the harbor, quite untreated, the evidence does not justify the conclusion that persons bathing in or that fish or oysters subsisting in such waters can sustain much further damage from the addition to them of the sewage of the Passaic Valley, after it has been treated in the manner proposed in the stipulation with the Government.

There remains to be considered, therefore, only the offensive odors, and unsightly deposits on the surface which it is claimed will be caused by the addition of putrescible matter to the water, and it is to this claim that a large part of the evidence introduced by the complainant is directed. Much evidence was introduced tending to prove that sewage collected from so great an area as that of the Passaic Valley Sewerage District would be stale, if not septic, when it reached the treatment plant at Newark Bay and that it would, therefore, hold in solution much organic matter which would not be removed by the screening and sedimentation processes proposed, with the result that it would cause disagreeable deposits on the surface of the water—"oily and sleek fields "—and offensive odors near the place of discharge and upon the wharves and shores adjacent to the Bay.

On the other hand witnesses of seemingly equal candor and learning, and with large practical experience, called by the defendants, testified that they were confidently of the opinion that the treatment of the sewage provided for in the stipulation with the United States would cause such purification of it that the results guaranteed therein would be fully realized.

It is much to be regretted that any forecast as to what the effect would be of the treatment and deeply sub-

merged discharge through multiple outlets proposed for this large volume of sewage must depend almost entirely upon the conflicting opinions of expert witnesses, for experience with such treatment and dispersion under even approximately like conditions seems entirely wanting. It is, however, of much significance that the authorities of the City of New York, after many years of investigation of the subject of sewage disposal, in their latest plans propose to adopt a treatment of screening and sedimentation and dispersal in deep water very similar to, but not so extensive and thorough as, that provided for in the stipulation between the defendants and the United States.

There is only one point upon which all the experts called for the opposing parties agree, viz.: that in the present state of learning upon the subject the amount of dissolved oxygen in water is the best index or measure of the degree to which it is polluted by organic substances, it seemingly being accepted by them all that upon the oxygen content in water depends its capacity for digesting sewage—that is for converting organic matter into inorganic and harmless substances by direct oxidation and by sustaining bacteria which assist in such conversion.

The witnesses agree that so long as there is sufficient dissolved oxygen in the water the process of digestion of the sewage will go forward without producing offensive odors and that when it sinks below a required percentage of saturation such odors will appear, but, unfortunately, there is a wide divergence of opinion among them as to what the required lower percentage is. The opinions of seemingly well qualified experts vary in giving from 25% to 50% of saturation as the amount of oxygen necessary to prevent the appearance of such offensive odors from decomposition of organic matter.

Measured by this dissolved oxygen standard, the evidence of the complainant is that as early as 1906 the

water adjacent to New York City, especially, in the Bronx and lower East River, was much polluted by sewage, but that the water in other parts of the Bay, especially near Robbins Reef Light was somewhat, but not greatly, contaminated. This condition, the evidence shows, continued with no very pronounced decrease in the oxygen content of the water until 1911 when the investigations embodied in the first testimony taken were concluded. And the evidence taken under the order of the court in 1919 shows an irreconcilable conflict in the testimony as to the then condition of the water, especially near Robbins Reef Light, and as to the probable condition of it to be anticipated in the future. In the interval from 1906 to 1919 the estimated growth of the population of New York City and its suburbs draining sewage into adjacent waters was in excess of 100,000 a year—an increase of population in the aggregate much greater than the total ·population of the Passaic Valley Sewerage District at present, and approximately equal to its estimated population in 1940—and it is undisputed that this New York sewage, untreated, was discharged from over 450 sewers directly into the adjacent waters, for the most part at or above the line of low tide, and that only in a few instances was it carried even to the pier heads.

It would seem, therefore, that, if the anticipations of the experts for the complainants, as to the results likely to be produced by the effluent from the sewer of defendants, were well founded, by the year 1919 conditions in the harbor should have become so pronounced and plain that there could not have been such conflict as the record shows in the testimony of trustworthy and competent scientists as to its then existing condition.

Considering all of this evidence, and much more which we cannot detail, we must conclude that the complainants have failed to show by the convincing evidence which the law requires that the sewage which the defendants intend

to discharge into Upper New York Bay, even if treated only in the manner specifically described in the stipulation with the United States Government, would so corrupt the water of the Bay as to create a public nuisance by causing offensive odors or unsightly deposits on the surface or that it would seriously add to the pollution of it.

The evidence taken in 1919 also discloses that other means than those specifically described in the Government stipulation may be resorted to, if needed, for the purpose of improving the character of the effluent from the sewer, viz.: slower and more prolonged sedimentation processes; additional screening; the aëration of the sewage before it reaches the treatment plant and again after treatment and before discharge into the tunnel conveying it to the Bay; and finally, if required, chemical treatment.

Having regard to the treatment of the sewage prescribed in what we regard as a valid contract on the part of the defendants with the Government of the United States, to the specific agreement therein for protection of the waters of Upper New York Bay from pollution, and to the means which the Government will have to secure further purification, if desired, by refusing to permit the discharge of sewage into the Bay to continue, we conclude that the prayer for injunction against the operation of the sewer must be denied.

We cannot withhold the suggestion, inspired by the consideration of this case, that the grave problem of sewage disposal presented by the large and growing populations living on the shores of New York Bay is one more likely to be wisely solved by coöperative study and by conference and mutual concession on the part of representatives of the States so vitally interested in it than by proceedings in any court however constituted.

The court, recognizing the importance of the ruling which it is making to the great populations interested,

as well in the State of New Jersey as in the State of New York, will direct that the decree denying the relief prayed for shall be without prejudice to the instituting of another suit for injunction if the proposed sewer in operation shall prove sufficiently injurious to the waters of the Bay to lead the State of New York to conclude that the protection of the health, welfare or commerce of its people requires another application to this court.

It results that the bill of complainant will be dismissed but without prejudice to a renewal of the application for injunction if the operation of the sewer of defendants shall result in conditions which the State of New York may be advised requires the interposition of this court.

*Bill dismissed without prejudice.*